**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| KEVIN DIAZ, | ) | CASE NO. 1:15-CV-1000 |
| | ) | |
| Plaintiff, | ) | JUDGE NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Kevin Diaz ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

his applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be REVERSED and REMANDED for

proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

On May 17, 2012, Plaintiff filed his applications for POD, DIB, and SSI, alleging a

disability onset date of January 29, 2012.  (Transcript ("Tr.") 11.)  The application was

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id.*)  On October 16, 2013, an ALJ held Plaintiff's

hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On November 15, 2013, the ALJ found Plaintiff not disabled.  (Tr. 22.)  On March 17, 2015, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)  On May 19, 2015, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 15, 16.)

Plaintiff asserts the following assignment of error:  the ALJ's residual functional capacity (RFC) finding failed to accommodate Plaintiff's visual and mental limitations.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in March 1968 and was 42-years-old on the alleged disability onset date.  (Tr. 21.)  He had a marginal education and was able to communicate in English.  (*Id.*)  He had past relevant work as a machine feeder, degreaser acid dripper, grinder/degreaser, packager, and furniture deliverer. (Tr. 20.)

### B.    Medical Evidence[1]

### 1.    Medical Reports

On December 16, 2011, Plaintiff treated with primary care physician Anita Singh, M.D. (Tr. 369.)  He complained of difficulty seeing at night. (*Id.*)  Dr. Singh diagnosed diabetes mellitus and hypertension and prescribed medication. (Tr. 371.)

---

[1]    Plaintiff contests the ALJ's decision only as it relates to Plaintiff's visual limitations and Dr. Swain's opinion regarding his mental limitations.  As a result, this Court will generally focus its discussion on evidence related to Plaintiff's visual limitations and Dr. Swain's findings.

2

On January 12, 2012, William Roscoe, O.D., performed an eye examination. (Tr. 365.)  Plaintiff's vision was 20/30 to 20/40 with glasses on. (*Id.*)  Dr. Roscoe recommended that Plaintiff consult with neuro-opthamology for an evaluation. (*Id.*)  Plaintiff treated with Dr. Singh in February 2012 and complained of a migraine headache with sensitivity to bright light. (Tr. 362.)  Dr. Singh prescribed medication. (Tr. 363.)

On February 28, 2012, Plaintiff underwent a diabetic eye examination with Karolinne Rocha, M.D. (Tr. 356.)  Plaintiff reported decreased temporal vision, flashing lights, and difficulty driving at night. (*Id.*)  Plaintiff's bilateral corrected visual acuity was approximately 20/50 to 20/40. (Tr. 357.)

William Cappert, M.D., examined Plaintiff on February 29, 2012, and noted a mild nuclear sclerosis cataracts in both eyes. (Tr. 358.)  Dr. Cappert opined that Plaintiff's decreased vision was not explained by his eye examination and the doctor questioned whether it was related to migraine headaches. (*Id.*)  That same day, Plaintiff treated with neurologist Hari Kunhi Veedu, M.D. (Tr. 348.)  Plaintiff reported having a headache three to four times per week over the past year. (Tr. 349.)  The headaches involved a throbbing pain and mild blurry vision. (*Id.*)  Plaintiff described visual hallucinations of seeing shadows once a week for the last four to five months. (*Id.*)  Dr. Veedu diagnosed poorly controlled diabetes, migraine-type headaches without papilledema, and mild diabetic neuropathy. (Tr. 351.)  Dr. Veedu recommended additional testing and prescribed Depakote for headaches. (Tr. 352.)

 Plaintiff treated with Dr. Singh on March 16, 2012, and he reported that

3

Depakote had provided moderate relief of his headaches. (Tr. 344.)   On March 20, 2012, Plaintiff complained to Dr. Veedu of headaches and a tingling sensation in his fingers. (Tr. 338-39.)  Plaintiff was less irritable but claimed that he still had severe pain. (Tr. 339.)  Dr. Veedu increased Plaintiff's prescriptions of Depakote and Gabapentin. (Tr. 341.)

On April 25, 2012, Plaintiff returned to Dr. Veedu and reported no improvement in his headaches or neuropathic pain. (Tr. 329.)   Dr. Veedu adjusted Plaintiff's medications. (Tr. 330.)  In May 2012, Plaintiff continued to report no change in his headaches. (Tr. 323.)  In June 2012, Plaintiff again reported neuropathic pain and indicated that he was unable to work. (Tr. 313-14.)  Dr. Veedu prescribed medication and referred Plaintiff to pain management. (Tr. 316.)

In September 2012, Plaintiff treated with pain management specialist Andrew Messiah, M.D. (Tr. 469.)  Plaintiff reported on-going pain in his lower legs and forearms for two years. (*Id.*)  He also told Dr. Messiah that he experienced visual blurring. (*Id.*) Dr. Messiah assessed severe diabetic neuropathy of the bilateral upper and lower extremities. (Tr. 472.)  The doctor directed Plaintiff to stop smoking and drinking alcohol and to control his diabetes and weight. (*Id.*)

**2.    Agency Reports**

On July 4, 2012, William Bolz, M.D., conducted a review of the record. (Tr. 104-05.)  Dr. Bolz opined that Plaintiff would be limited to occasional climbing of ladders, ropes, and scaffolds and to frequent balancing. (Tr. 104.)  Dr. Bolz opined that Plaintiff's near and far acuity were "limited" in both eyes. (Tr. 104-05.)  Plaintiff's depth perception, accommodation, color vision, and field of vision were unimpaired. (Tr. 105.)

4

Dr. Bolz explained that due to Plaintiff's 20/50 visual acuity, Plaintiff was precluded only from driving at night. (*Id.*)  The doctor also noted that Plaintiff reported he could see well with his glasses during the day and completed his activities of daily living, including driving. (*Id.*)

On December 22, 2012, Charles Misja, Ph.D., performed a psychological evaluation of Plaintiff. (Tr. 480.)  Plaintiff reported that he experienced depression and feelings of worthlessness. (Tr. 481.)  Plaintiff lived alone, but his girlfriend frequently visited and cared for him. (*Id.*)  Plaintiff had been fired for entering into a verbal altercation with his boss. (Tr. 482.)  He described other verbal altercations and indicated that he preferred to work alone. (*Id.*)  Plaintiff had little social interaction and liked to remain home by himself, although he enjoyed helping friends. (*Id.*)  Dr. Misja noted that Plaintiff was entirely unrepentant of his quick temper and verbal aggressiveness in the workplace, even though he had lost a few good jobs as a result. (Tr. 484-85.)  Dr. Misja opined that Plaintiff would be able to understand and implement ordinary verbal instructions and would have minimal problems in maintaining attention, concentration, persistence, and pace to perform simple and multi-step tasks. (Tr. 485.) Plaintiff was likely to have severe problems in responding appropriately to supervision and to coworkers. (*Id.*)  Dr. Misja opined that Plaintiff would have moderate to severe problems with his ability to respond appropriately to work pressures in a workplace setting. (Tr. 486-86.)

In January 2013, psychologist Jennifer Swain, Psy.D., reviewed the record. (Tr. 128-30.)  She opined that Plaintiff would be able to perform simple, one- and two-step

5

tasks that did not require reading written instructions. (Tr. 128.)  Because Plaintiff's focus on physical pain would cause some problems in maintaining concentration, Dr. Swain opined that Plaintiff could perform static tasks without strict demands on production or pace. (Tr. 129.)  He could work in a setting where social distractions and demands were minimal. (*Id.*)  Plaintiff could not participate in ongoing work with the general public, but could engage in brief, occasional, and superficial interactions with others. (*Id.*)  Plaintiff could sustain work in solitary and relatively static setting where changes were easily explained and some time was provided to make any needed adjustments. (*Id.*)

On January 14, 2013, Paul Morton, M.D., conducted a review of the record and opined as to Plaintiff's physical limitations. (Tr. 126-27.)  Dr. Morton opined that Plaintiff was limited to medium exertional work with frequent balancing and occasional climbing of ladders, ropes, and scaffolds. (Tr. 126.)  The doctor found that Plaintiff's near and far acuity were "limited" in both eyes. (Tr. 127.)  Dr. Morton opined that Plaintiff was restricted from night driving due to problems with lights and early cataracts. (*Id.*)

**C.    Hearing Testimony**

**1.    Plaintiff's Hearing Testimony**

Plaintiff testified that he stopped looking for work due to his neuropathy. (Tr. 56.) He experienced vibrations accompanied by a sharp, tingling feeling throughout his body at all times. (Tr. 56-58.)  Plaintiff could not work because he had difficulty feeling and picking up objects. (Tr. 67.)  If he attempted to hold objects, like a coffee cup or gallon of milk, he would drop them. (*Id.*)  Plaintiff could stand or walk for no longer than fifteen

6

minutes. (Tr. 68.)  Plaintiff went to the store in the early hours in order to avoid being

around people. (*Id.*)  Plaintiff grew panicked and frustrated around other people. (*Id.*)

Plaintiff believed his medication did not help to alleviate his mental health issues. (Tr.

71.)

### 2. Vocational Expert's Hearing Testimony

Thomas Nimberger, a vocational expert, testified at Plaintiff's hearing.  The ALJ

asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work

experience. (Tr. 86-87.)  The individual could perform light work and occasionally climb

ladders, ropes, and scaffolds. (*Id.*)  The individual could frequently balance. (*Id.*)  The

individual was limited to unskilled work; could maintain concentration, persistence, and

pace for unskilled work; and could interact with the general public occasionally. (*Id.*)

The individual was limited to jobs that involved only routine-type changes. (*Id.*)  The VE

testified that Plaintiff could perform such jobs as a mail clerk, bench assembler, and

packager. (Tr. 87.)

The ALJ asked the VE to assume a hypothetical individual with the same

restrictions as above, as well as a limitation on the use of hands for occasional

fingering. (Tr. 88.)  Plaintiff's counsel added to this hypothetical question the additional

limitations of no fast-paced work and no production rate quotas. (Tr. 93-94.)  The VE

testified that Plaintiff could perform such jobs as counter clerk, gate guard, and bakery

worker. (Tr. 89, 94.)

Counsel asked the VE what degree of social interaction the gate guard job

involved. (Tr. 91.)  The VE indicated that the position required no more than occasional

interaction with the public. (*Id.*)

## III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience.  20 C.F.R. §§ 404.1520(d) *and*

8

416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.   The claimant has not engaged in substantial gainful activity since January 26, 2011, the alleged onset date.

3.   The claimant has the following severe impairments: loss of visual acuity, peripheral neuropathy, mood disorder, and personality disorder.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) with the following additional limitations: occasional climbing of ladders, ropes, or scaffolds, frequent balancing, can maintain concentration, persistence, and pace for unskilled work, is limited to occasional interaction with the general public, there are no limitations on interacting with coworkers and supervisors, and is limited to routine type changes in workplace settings.

6.   The claimant is unable to perform any past relevant work.

7.   The claimant was born on March 27, 1968, and was 42-years-old, which is defined as a younger individual age 18-49 on the alleged disability onset date.

9

8.    The claimant has a marginal education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 26, 2011, through the date of this decision.

(Tr. 11-22.)

## V.  LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that

10

the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.    Plaintiff's Assignment of Error

Plaintiff argues that the ALJ's RFC finding is flawed because it fails to account for the mental limitations Dr. Swain recommended, as well as the visual limitations Drs. Bolz and Morton recommended.  The Commissioner asserts that any alleged error by the ALJ with regard to these medical source opinions is harmless.

It is well established that an ALJ is not required to discuss each and every piece of evidence in the record for her decision to stand.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of a medical source contradicts her RFC finding, an ALJ must explain why she did not include its limitations in her determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.)  ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source

11

opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).  The Court will address Plaintiff's alleged mental and visual limitations in turn.

### a. Mental Limitations

Plaintiff argues that the ALJ improperly failed to account for the social interaction, production, and pace limitations that Dr. Swain recommended in the RFC. The Commissioner contends that the VE's testimony demonstrates that the addition of production and pace-based limitations would not have affected the jobs the VE identified Plaintiff could perform.  The Commissioner does not address Plaintiff's argument with regard to social limitations.

In her RFC assessment, Dr. Swain opined that Plaintiff (1) could not perform ongoing work with the general public, but could engage in brief, occasional, and superficial interactions with "others," and (2) could not perform work that required "strict demands on production or pace." (Tr. 129.)  Plaintiff maintains that when Dr. Swain limited his interactions with "others," the psychologist intended "others" to mean supervisors and coworkers.  Given that Dr. Swain specifically limited Plaintiff to no ongoing work with the public, Drs. Swain's limitation to brief, superficial, and occasional interactions with "others" logically relates to Plaintiff's ability to interact with coworkers and supervisors.

In her decision, the ALJ explained that she afforded "great weight" to Dr. Swain's conclusions as they were consistent with the objective and subjective evidence of record. (Tr. 15.)  The ALJ provided no further analysis of Dr. Swain's opinion.  When

12

formulating the RFC, the ALJ did not include limitations that accommodated Dr. Swain's pace or production limitations. (Tr. 17.)  The ALJ limited Plaintiff to occasional interaction with the general public, but placed no limitations on Plaintiff's ability to interact with coworkers and supervisors or "others." (*Id.*)  Because the ALJ's calculation of Plaintiff's RFC was less restrictive than Dr. Swain's limitations, and therefore contradicted the psychologist's opinions, S.S.R. 96-8p required the ALJ to explain her decision not to include the limitations in Plaintiff's RFC.

The Commissioner points out that Plaintiff's counsel asked the VE to add production and pace-based limitations to the hypothetical question posed by the ALJ. In response, the VE testified that limiting Plaintiff to work that was not fast-paced and involved no production rate quotas would not affect the jobs Plaintiff could perform.[2] The Commissioner contends that, as a result, remand for the ALJ to further address Dr. Swain's opinion would serve no purpose.

---

[2]     The exchange between counsel and the VE proceeded as follows:

Q:     If we were to just take the judge's third hypothetical question and add the additional limitation of no fast paced or quota production work, would that change your answer at all to number three?

A:     I want to make sure I'm understanding your hypothetical.  Are you interpreting no quotas literally?  And the reason I ask that, not as an argumentative point, but all work requires a quota.  You have to put out a product.  You have to do something.

Q:     No production rate quotas.

A:     You're talking about production rate.  None of this is really production rate except the . . . bakery worker . . . I'd have to reduce those numbers probably by at least 25 percent.

(Tr. 93-94.)

13

The VE's testimony with regard to production and pace-based limitations makes this issue a close call.  The VE, however, did not address whether restrictions on Plaintiff's ability to interact with coworkers and supervisors would impact the available jobs.[3]  Nor does the ALJ's decision explain why she failed to credit this portion of Dr. Swain's opinion as SSR 96-8p requires.  As a result, remand is necessary for the ALJ to evaluate the social limitations Dr. Swain assigned.  Given that remand is necessary for the ALJ to address social limitations, the ALJ should also clarify her opinion as it relates to Dr. Swain's limitations on production and pace.

Accordingly, on remand, the ALJ should either adopt the limitations on social interaction, pace, and production that Dr. Swain assigned or explain her decision not to adopt such limitations.  If the ALJ does adopt the limitations, the ALJ should obtain additional evidence to determine whether an individual with those limitations would be precluded from working in jobs available in the national economy.

### b.  Visual Limitations

Plaintiff also argues that the ALJ erred in failing to explain why she did not include the visual limitations that Drs. Bolz and Morton recommended in the RFC.  Drs. Bolz and Morton found that Plaintiff's vision was impaired such that he had "limited" near and far acuity and was unable to drive at night.  The Commissioner

---

[3]    The VE testified that the gate guard job involved no more than occasional interaction with the public. (Tr. 91.)  When describing the nature of public interaction for this occupation, the VE stated that 99 to 100 percent of the time, the individual would not have to speak to "anyone." (*Id.*) Nevertheless, the VE did not specifically address what type of interaction with supervisors and coworkers was necessary to perform the job.  As a result, this Court cannot conclude that the ALJ's failure to discuss Dr. Swain's limitation was harmless.

contends that even if the ALJ failed to include visual limitations in the RFC, Plaintiff has failed to demonstrate that his visual limitations rendered him disabled.

In her decision the ALJ concluded that Plaintiff's loss of visual acuity was a severe impairment at Step Two of the sequential evaluation. (Tr. 13.)  The ALJ acknowledged that Drs. Bolz and Morton opined that Plaintiff's near and far acuity were "limited" and that Plaintiff was precluded from driving at night. (Tr. 19.)  The ALJ afforded these physicians' opinions some weight, because the opinions were somewhat consistent with the objective evidence of record, but the ALJ explained that additional evidence showed that Plaintiff ought to be limited to a reduced range of light work. (Tr. 19-20.)  The ALJ did not include visual limitations in the RFC or explain why she omitted such limitations. (Tr. 17.)

Various factors make this issue a close question.  As the Commissioner points out, none of the positions the VE identified require nighttime driving.[4] Thus, Plaintiff was not prejudiced by the ALJ's failure to include this limitation in the RFC.  In addition, Dr. Bolz opinion appears to reflect that the only visual limitation the doctor intended to recommend was a nighttime driving limitation. (Tr. 105.)  Dr. Bolz explained that Plaintiff was precluded from driving at night due to diminished visual acuity, but could see well with his glasses during the day and completed his activities of daily living, including driving. (*Id.*)  On the other hand, Dr. Morton's opinion is not as clear in this regard.  Dr.

---

[4]     These positions were:  Mail clerk (DOT 209.687-026, 1991 WL 671813); bench assembler (DOT 706.684-022, 1991 WL 679050); packager (DOT 559.687-074, 1991 WL 683797); counter clerk (DOT 249.366-010, 1991 WL 672323); gate guard (DOT 372.667-030, 1991 WL 673099); and bakery worker (DOT 524.687-022, 1991 WL 674401).

Morton explained that Plaintiff was restricted from night driving because he may have problems with lights and early cataracts. (Tr. 127.)

Nor has Plaintiff demonstrated that his "limited" acuity, as identified by Drs. Bolz and Morton, affects his ability to work, aside from precluding night driving.  Plaintiff claims that his visual impairment resulted in "daily blurred vision" and would render him unable to perform jobs that require clear visual focus for two-thirds of the workday. Plaintiff, however, does not point to any evidence in the record to support this claim.  It is well established that the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled], *when the claimant is proving the extent of his impairments*.") (emphasis added).

Given the foregoing, and because remand is necessary on another basis, the ALJ should clarify her decision as it relates to Drs. Bolz and Morton's visual findings. On remand, the ALJ should either adopt any visual limitations Drs. Bolz and Morton assigned or explain her decision not to do so.  If necessary, the ALJ should obtain additional evidence to determine whether an individual with any additional visual limitations would be precluded from working in jobs available in the national economy.

16

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be REVERSED and REMANDED for proceedings

consistent with this opinion.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: January 26, 2016

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See* *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

17